# UNITED STATES DISTRICT COURT

for the

Eastern District of Tennessee

 **FILED**

AUG 2 8 2025

Clerk, U. S. District Court
Eastern District of Tennessee
At Greeneville

In the Matter of the Search of )
)
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )     Case No. 2:25-MJ-176   SEALED
)
Information Associated with the Facebook User )
Shawn.Renfro.2025 that is Stored at Premises )
Controlled by Meta Platforms, Inc.

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Facebook user accounts associated with SHAWN.RENFRO.2025 as further described in Attachment A, which is incorporated by reference.

located in the ___Eastern___ District of ___Tennessee___ , there is now concealed *(identify the person or describe the property to be seized)*:

User profile(s), activity logs, message content and location information as more fully described in Attachment B, which is incorprorated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2251 | Sexual Exploitation of Children |
| 18 U.S.C. 2252 | Receive or Distribute Material Involving the Sexual Exploitation of Minors |
| 18 U.S.C. 2252A | Receive or Distribute Child Pornography in Interstate Commerce |

The application is based on these facts:

Please see attached Affidavit of FBI Special Agent Erik K. Doell which is incorporated by reference.

☑ Continued on the attached sheet.

☑ Delayed notice of  180  days *(give exact ending date if more than 30 days:*   02/20/2026   *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Erik Doell*

*Applicant's signature*

Erik K. Doell, Special Agent, FBI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
___telephone___     *(specify reliable electronic means)*.

Date:   08/28/2025

*Cynthia Richardson Wyrick*

*Judge's signature*

City and state:  Greeneville, Tennessee          Cynthia Richardson Wyrick, U.S. Magistrate Judge

*Printed name and title*


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

IN THE MATTER OF THE SEARCH OF:    )
                                   )
INFORMATION ASSOCIATED WITH        )
FACEBOOK USER SHAWN.RENFRO.2025    )
THAT IS STORED AT PREMISES         )
CONTROLLED BY META PLATFORMS,      )
INC.                               )

No. 2:25-MJ- \ 7 0

JUDGE WYRICK

TO BE SEALED

## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

1.    I, Erik K. Doell, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

2.    I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure to require Meta Platforms, Inc. (hereafter "Meta") to disclose to the

government records and other information, including the contents of communications, associated

with the above-listed Facebook account that are stored at premises owned, maintained, controlled,

or operated by Meta, a company located in Menlo Park, California (CA).  The information to be

disclosed by Meta and searched by the government is described in the following paragraphs and

in Attachments A and B.

3.    I am a Special Agent (SA) assigned to the Knoxville Division, Johnson City

Resident Agency (JCRA), of the Federal Bureau of Investigation (FBI), and have been so since

February 2009. I am authorized to investigate violations of laws of the United States and to execute

warrants issued under the authority of the United States. Through the course of my training and

experience, I am familiar with investigations and enforcement of federal child pornography laws

1

in which electronic devices are used as a means to produce, transmit, collect, and store child sex abuse material (CSAM). I have knowledge with how criminals use electronic devices, such as mobile telephones, to store information related to criminal activity and had the opportunity to observe and review examples of CSAM (as defined in 18 U.S.C. § 2256).

4.      This affidavit is submitted in support of an application for a search warrant to search the Facebook account listed in Attachment A and items to be seized as described in Attachment B.

5.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence and instrumentalities of violations of Title 18 U.S.C. §§ 2251, 2252 and 2252A exist within the Facebook account listed in Attachment A.

## JURISDICTION

6.      This court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is a district court of the United States that has jurisdiction over the offense(s) being investigated.

## DEFINITIONS

7.      The following definitions may, or may not, apply to this Affidavit and corresponding Attachments A & B:

a. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format. *See* 18 U.S.C. § 2256(5).

b. "Minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

c. "Child Erotica" as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

d. "Child Sexual Abuse Material," as used herein, includes the definition in 18 U.S.C § 2256(8) - any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct - as well as any visual depiction, the production of which involves the use of a minor engaged in "sexually explicit conduct," as that term is defined in 18 U.S.C. § 2256(2).

e. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or

3

(e) lascivious exhibition of the anus, genitals, or pubic area of any person. See 18 U.S.C. § 2256(2).

f.   The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

g.   The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN OR WHO PRODUCE, RECEIVE, AND/OR POSSESS CHILD PORNOGRAPHY

8.   Based on my previous investigative experience related to child-exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography:

4

a. Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b. Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Such individuals almost always possess and maintain child pornographic material in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain those materials and child erotica for many years.

d. Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly. Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

5

e. Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices using forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[1]

f. Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain contact information (e.g., online messaging accounts, email addresses, etc.) of individuals with whom they have been in contact and who share the same interests in child pornography.

g. Such individuals prefer not to be without their child pornography for any prolonged period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h. Even if the individual uses a portable device (such as a mobile phone) to access the Internet and child pornography, it is more likely than not that evidence of this access will be stored in a cellphone account as set forth in Attachment A.

## BACKGROUND REGARDING THE INTERNET

9. Through my training, knowledge, and experience – including the training and experience of other law enforcement personnel involved – in this investigation, I know the Internet is a worldwide computer network that connects computers, smart technology, and various cellular devices, and allows communications and the transfer of data and information across state and national boundaries. A user accesses the Internet from a computer network or Internet Service

6

Provider ("ISP") that connects to the Internet. The ISP assigns each user an Internet Protocol ("IP") Address. Each IP address is unique.

10.    Every computer or device on the internet is referenced by a unique IP address the same way every telephone has a unique telephone number. An IP address is a series of four numbers separated by a period, and each number is a whole number between 0 and 255. An example of an IP address is 192.168.10.102. Each time an individual accesses the Internet, the computer from which that individual initiated access is assigned an IP address.

11.    A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers. Most ISP's employ dynamic IP addressing; that is, they allocate any unused IP address at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet. A dynamic IP address is reserved by an ISP to be shared among a group of computers over a period or duration of time. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

12.    The ISP logs the date, time, and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records, depending on the ISP's record retention policies.

13.    Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornographers can now transfer photographs from a camera onto a computer-readable format with a device known as a scanner. With advent of digital cameras, the images can now be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer by way of telephone, cable, or

7

wireless connection. Child pornography can be transferred via electronic mail or through file transfer protocols (FTP) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials.

14.     The computer's capability to store images in digital form makes it an ideal repository for child pornography. External storage devices such as USB (or "thumb") drives are inexpensive and can store hundreds or thousands of images and video files, depending on their capacity and the size of the files contained therein. Larger devices such as "hard" drives, though more expensive than USB drives, are still easily obtainable by consumers and can store multiple times the amount of data, equal to hundreds of thousands of images.

15.     These drives can store images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime." Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

16.     With Internet access, a computer user can transport an image file from the Internet or from another user's computer to his own computer, so that the image file is stored in his computer. The process of transporting an image file to one's own computer is called "downloading." The user can then display the image file on his computer screen and can choose to "save" the image on his computer and/or print out a hard copy of the image by using a printer device (such as a laser or inkjet printer). Importantly, computer files or remnants of such files can

8

be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.

17.     Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.

18.     In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

## FORENSIC ANALYSIS

19.     Based on my training, knowledge, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period or duration of time on the device. This information can sometimes be recovered with forensic tools.

9

20. Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how each device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on each device because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited; Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

    b. Forensic evidence on a device can also indicate who has used or controlled a device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence or place of business.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.

10

Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

21.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to, computer-assisted scans of the entire medium that might expose many parts of the device to human inspection to determine whether it is evidence described by the warrant. Further, given the wide geographic proximity of the alleged offenses, it may be prudent to conduct the forensic examination outside of the issuing District.

## PROBABLE CAUSE

22.  On or about 02/07/2025, the FBI became aware that the MINOR VICTIM[1], was communicating with various adult subjects in both the United States and Canada. During the investigation in New Jersey, Detective J. Ramm with the Old Bridge Police Department, Old Bridge, NJ identified the following messages between the Victim and Shawn Renfro (SUBJECT).

---

[1] The identity of MINOR VICTIM (female, DOB: 05/13/2009) is known to law enforcement. MINOR VICTIM'S name and identifying information is being withheld to protect MINOR VICTIM'S identity.

23.    The following derogatory communications occurred between the Victim and SUBJECT on Facebook Messenger:

    a.  October 4, 2024:

- 0924 hrs SUBJECT – Picture of adult male's face

- 1347 hrs MINOR VICTIM – Hi

- 1352 hrs MINOR VICTIM – From emerald[2]

- 2011 hrs MINOR VICTIM – Hi

- 2014 hrs MINOR VICTIM – And I will bring the body bag

- 2017 hrs MINOR VICTIM -Ofc Daddy

- 2019 hrs MINOR VICTIM – How old are you

- 2020 hrs MINOR VICTIM – Im 15

- 2020 hrs MINOR VICTIM – Also you are not fucking 45

- 2020 hrs MINOR VICTIM – Make it 77

- 2020 hrs MINOR VICTIM – Pussy

- 2024 hrs MINOR VICTIM – Send me 'eggplant emoji'

- 2025 hrs MINOR VICTIM – If u send I will send

- 2029 hrs MINOR VICTIM – Hurry up im borny

- 2029 hrs MINOR VICTIM – Horny

- 2033 hrs MINOR VICTIM – Come over

- 2037 hrs MINOR VICTIM – Wyd

- 2037 hrs MINOR VICTIM – No

---

[2] Emerald refers to Emerald Chat, a mobile application that allows people to talk to other people from around the world for free.

- 2038 hrs MINOR VICTIM – Just send Me the dick

- 2041 hrs MINOR VICTIM – Can u send me a dp

- 2045 hrs SUBJECT – Hey babe are you playing with yourself yes or no I'm horny are you yes or no you s***

- 2045 hrs MINOR VICTIM – Yes

- 2045 hrs MINOR SUBJECT – S*** call me Nick when you naked baby and I'll help you out and you help me out or I love you still

- 2113 hrs MINOR VICTIM – Hi

24.     The Facebook account for SUBJECT was identified to be https://www.facebook.com/shawn.renfro.2025, account number 61560998160687 with associated email addresses: renfro.s37857@gmail.com and shawnrenfro952@gmail.com, and phone number 423-523-5402. A preservation letter was served on Facebook for SUBJECT's account on or about March 19, 2025.

25.     A subpoena to Emerald Chat located an IP match to a known IPv6 address for SUBJECT: 2600:6c5c:6bf0:9800:fe39:504:e51f:ed94. This IPv6 address is a match to the IPv6 address provided by Facebook in reference to before-mentioned subpoena for subscriber records.

26.     A subpoena to Charter Communications for the IPv6 address 2600:6c5c:6bf0:9800:fe39:504:e51f:ed94 returned to Shawn Renfro, 128 Burton Road, Apt B28, Rogersville, TN 37857.

27.     A subpoena to Tracfone for 423-523-5402 returned the phone number was a pre-paid account activated on 6/13/2024 with a profile city of Rogersville, TN.

28.     On or about March 11, 2025, MINOR VICTIM was shown a photo of a male taken from the Facebook profile picture of Facebook account shawn.renfro.2025, whom she stated

13

identified as being "Shawn" whom she communicated with on Facebook.

29. . Based on my training and experience, Facebook may contain data no longer accessible on the physical device. The information obtained from the account would help us locate additional victims and/or subjects associated with this case.

## INFORMATION ON FACEBOOK

30. Facebook, now "Meta," owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows individuals to specifically communicate with another person through a Facebook application called "Messenger." In my training and experience, people who engage in online criminal activity often also utilize Facebook to meet victims and other offenders and to chat. Even if Facebook was not utilized in the chat at issue, there is probable cause to believe there will be evidence regarding the online solicitation of minors within the target Facebook account.

31. . Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the public.

32. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

33. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group

14

identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

34.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

35.  .   Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

36.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

37.     Facebook users can exchange private messages on Facebook with other users. These messages, which are like e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

38.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

39.     Facebook has a "like" feature that allows users to give positive feedback or connect to pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third party (i.e., non-Facebook) websites. Facebook users can also become "fans" of Facebook pages.

40.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things. Each Facebook account has an activity log,

16

which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but people who visit the user's Facebook page cannot viewed it.

41.    Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

42.    The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

43.    Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

44.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that user's access or use of that application may appear on the user's profile page. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile:    profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

17

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

45. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

46. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user because of the communications.

47. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant

18

at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the user accessed or used the account. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information to conceal evidence from law enforcement).

48.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

19

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

49.     I anticipate executing this warrant under the Electronic Communications Privacy Act, particularly 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), by using the warrant to require Meta Platforms, Inc. to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B.     Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, which will be subject to seizure. The government will execute this warrant by serving it on Meta Platforms, Inc., who will compile records at a time convenient to it. Therefore, I request that the Court authorize the execution of the warrant at any time of day or night.

## CONCLUSION

50.     I respectfully request that the attached warrant be issued authorizing the search of the Facebook user account described in Attachment A and seizure of the items described in Attachment B. I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Respectfully submitted,

*Erik Doell*

Erik K. Doell, Special Agent
FBI Nashville Division, JCRA

Sworn to and subscribed before me by telephone or other reliable electronic means

this _28_ day of August 2025.

CYNTHIA RICHARDSON WYRICK
UNITED STATES MAGISTRATE JUDGE

20

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the following Meta (Facebook) accounts that are stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California, specifically: Facebook user shawn.renfro.2025, account ID number 61560998160687, and/or email addresses renfro.s37857@gmail.com and shawnrenfro952@gmail.com, for the timeframe of October 4, 2024 to the present.

## ATTACHMENT B
### Particular Things to be Seized

**I.     Information to be disclosed by Meta Platforms, Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of **Meta Platforms, Inc.** ("Meta"), including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information including but not limited to the following for Meta User: shawn.renfro.2025, account ID number 61560998160687, and/or email addresses: renfro.s37857@gmail.com and/or shawnrenfro952@gmail.com;  full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

(d)     All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers;

future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f) All "check ins" and other location information;

(g) All IP logs, including all records of the IP addresses that logged into the account;

(h) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i) All information about the Facebook pages that the account is or was a "fan" of;

(j) All past and present lists of friends created by the account;

(k) All records of Facebook searches performed by the account;

(l) All information about the user's access and use of Facebook Marketplace;

(m) The types of service utilized by the user;

(n) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

(q) Any and all geo-location data information.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of Sexual Exploitation of a Minor and Material Constituting or Containing Child Pornography, in violation of 18 U.S.C. §§ 2251, 2252, and 2252A, from October 4, 2024, until the date of the warrant, for the user ID's identified on Attachment A.